**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**LUMINITA NODIT**
DCS Local Office in Tippecanoe County
Lafayette, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**FILED**

Feb 25 2013, 9:34 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) ) |
| L.M. (MINOR CHILD) AND M.M. (MOTHER), | ) ) ) ) |
| Appellant-Respondent, | ) No. 79A02-1208-JT-678 |
| vs. | ) ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta Rush, Judge
The Honorable Faith Graham, Magistrate
Cause No. 79D03-1205-JT-56

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

M.M. ("Mother") appeals the involuntary termination of her parental rights to her child, L.M., claiming there is insufficient evidence supporting the trial court's judgment. We affirm.

**Facts and Procedural History**

Mother is the biological mother of L.M., born in June 2011. The facts most favorable to the trial court's judgment reveal that in August 2011 the local Tippecanoe County office of the Indiana Department of Child Services ("TCDCS") was notified that L.M. had been "life-lined" to Peyton Manning Children's Hospital at St. Vincent in Indianapolis with cerebral hemorrhages and other physical symptoms associated with Shaken Baby Syndrome. Tr. p. 40. The next day, TCDCS assessment case manager Melissa Haywood ("Haywood") traveled to Indianapolis and met with hospital staff, as well as with Mother and her husband.[1]

Hospital personnel informed Haywood that L.M. had suffered life-threatening injuries, including a "right occipital fracture" or "crack at the back of her skull."

---

[1] For clarification purposes we note that Mother married M.I.M. ("Husband") when she was approximately three months pregnant with L.M. Mother and Husband were still married and living together at the time TCDCS received the referral concerning L.M. Paternity testing later established W.K. ("Father") as L.M.'s biological father. Shortly thereafter, Husband was dismissed from the underlying CHINS case. The parental rights of Father were terminated by the trial court in its July 2012 termination order. Father does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal regarding the termination of her parental rights to L.M.

Exhibits, Intake Officer's Report of Preliminary Inquiry and Investigation, p. 2.[2] Haywood also learned that a tube had been inserted into the baby's skull to drain the blood, and a feeding tube was required in order to provide the baby nutrition. Other injuries could not be fully assessed at that time because L.M.'s condition was "too fragile" to complete all the necessary tests and examinations. Id.

During the next several days, Haywood met with Dr. Courtney Demetris who provided additional information concerning the extent of L.M.'s injuries. Dr. Demetris informed Haywood that L.M.'s MRI results indicated the child had suffered a separate, older injury approximately three to four weeks earlier which was causing bleeding on the brain. Id. Dr. Demetris further reported that L.M. had been the victim of "at least 2 different incidents of physical abuse," that the child's skull fracture was the result of a "definitive impact," that L.M. had "multiple areas of stroke in the brain" as a result of these injuries, and that L.M. had also suffered an "excessive number of hemorrhages in the eyes." Id. Dr. Demetris went on to describe L.M.'s eye injuries as "the most severe" type of eye injuries possible, with "blood in both eyes" and in "all four quadrants and all three layers." Id. The doctor further noted that due to the severity of L.M.'s injuries, there was a risk for blindness and developmental delays.

When questioned at the hospital as to how L.M. had received such severe injuries, neither Mother nor Husband was able to provide a plausible explanation. Although both parents initially implicated a neighbor, who allegedly spent fifteen minutes alone with

---

[2] Because the pages of the Volume of Exhibits submitted on appeal are not separately enumerated, we cite directly to the exhibit.

L.M. on one occasion prior to the child's injuries, it was later determined that the neighbor had never held nor otherwise interacted with the baby in the past. Both Mother and Husband later acknowledged that they had been the sole caregivers for L.M. during the time frame that the injuries occurred. In addition, Mother confided to Haywood that she would sometimes get "frustrated" with L.M. and had been experiencing "a high amount of stress while caring for the child." Id. at 3. Husband likewise confirmed that Mother would "lose her temper easily," especially when the baby cried. Id. Both parents also acknowledged that L.M. had begun vomiting and having diarrhea approximately three days earlier, but they did not seek medical attention until L.M. "did not look like herself," was "pale and whining," and "didn't pick up her arms as she normally [did] to rub her eyes after waking from a nap." Id.

As a result of its assessment, TCDCS took L.M. into emergency protective custody prior to the child's release from the hospital and filed a petition alleging L.M. was a child in need of services ("CHINS"). L.M. was so adjudicated following a hearing in September 2011. Meanwhile, Mother was arrested and incarcerated for Class B felony neglect of a dependent resulting in serious bodily injury.

In November 2011, the trial court issued a dispositional decree, formally removing L.M. from Mother's care and custody and granting wardship of the child to TCDCS. The court's dispositional order also directed Mother to successfully complete a variety of tasks and services designed to address her parenting deficiencies and to ensure the safety of the child. Among other things, Mother was ordered to: (1) notify TCDCS within 48

4

hours of her release from jail; (2) complete a psychological evaluation and follow all resulting recommendations; (3) participate in supervised visitation with L.M. as directed by TCDCS; (4) participate in a parenting assessment and follow all recommendations; (6) pay all child support as ordered; and (7) follow the dictates of the safety plan whenever in the presence of the child and ensure that the child is properly supervised at all times by someone approved of by TCDCS.

In January 2012, Mother pleaded guilty to the neglect charge. The criminal court accepted Mother's plea, and in February 2012 Mother was sentenced to ten years imprisonment, with eight years to be executed (six years at the Indiana Department of Correction and two years through a community corrections program) and two years suspended to probation. In May 2012, TCDCS filed a petition seeking the involuntary termination of Mother's parental rights to L.M. An evidentiary hearing on the termination petition was held in July 2012.

During the termination hearing, TCDCS presented substantial evidence concerning Mother's habitual pattern of involvement in physically abusive relationships, admitted history of alcohol and drug use, and Mother's admission that she felt she could easily become addicted to alcohol. TCDCS also established that Mother, who remained incarcerated, was not scheduled to be released until February 2014. In addition, TCDCS presented evidence showing Mother had failed to successfully complete all of the trial court's dispositional orders, including a psychological evaluation, parenting assessment, and substance abuse assessment, due in large part to her continuing incarceration. As for

5

L.M., TCDCS presented evidence establishing that although the child's long-term prognosis remained uncertain, L.M.'s overall physical condition had improved greatly, the child's eye-sight had been recovered, and L.M. was thriving in pre-adoptive foster care.

At the conclusion of the termination hearing, the trial court took the matter under advisement. Several days later, the trial court entered its judgment terminating Mother's parental rights to L.M. This appeal ensued.

**Discussion and Decision**

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Here, in accordance with Indiana Code section 31-35-2-8(c), the trial court entered specific factual findings and conclusions in terminating Mother's parental rights. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id.

6

"Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

7

> (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)     that termination is in the best interests of the child; and
>
> (D)     that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[3] "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Mother challenges the sufficiency of the evidence supporting the trial court's conclusions as to subsection (b)(2)(B) of the termination statute cited above. See I.C. § 31-35-2-4(b)(2).

## I. Conditions Remedied

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. See L.S., 717 N.E.2d at 209. Because we find it to be dispositive, we limit our review to Mother's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's

---

[3] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

termination statute, namely, whether TCDCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of L.M. outside Mother's care will not be remedied.

When making a determination as to whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The trial court may also consider any services offered to the parent by the local Indiana Department of Child Services office (here, TCDCS) and the parent's response to those services, as evidence of whether conditions will be remedied. Id. Moreover, TCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Although Mother acknowledged that, at the time of the termination hearing, she had "two (2) actual years to serve in prison, followed by a year of community corrections," had failed to complete even one of the court-ordered reunification services due to her incarceration, and had no bond with L.M., she nevertheless insists on appeal that "it will not take long to ascertain her abilities" to parent L.M. once she is released from prison and therefore it was "premature" for the trial court to terminate her parental rights. Appellant's App. pp. 9, 11, 16. Mother further insists that her "plea to Neglect of a Dependent as a class B felony was a pragmatic decision, calculated to achieve a suspended sentence that would head off a TPR." Id. at 11. Mother therefore contends that the trial court committed reversible error in terminating her parental rights.

Here, the trial court made numerous, detailed findings in its judgment terminating Mother's parental rights to L.M. addressing Mother's history of abusive relationships, admitted past substance use, and unresolved parenting issues. In so doing, the trial court noted Mother was arrested at age eighteen in New York for battery against a seventeen-year-old high school student, has a "long-term history of instability" including being in the foster care system from age fourteen to nineteen as a result of abuse and neglect by her own parents, was "homeless" in New York before relocating to Lafayette, Indiana, admitted to a history of drug and alcohol use, and self-reported a history of Post Traumatic Stress Disorder, Battered Women's Syndrome, and Depression although she denied any "formal diagnoses." Id. at 14.

Regarding the circumstances surrounding L.M.'s life threatening injuries, the trial court found that upon L.M.'s arrival at Peyton Manning's Children's Hospital at St. Vincent, the child appeared "listless and pale" and was admitted to the Intensive Care Unit with "cerebral hemorrhages and other physical symptoms associated with Shaken Baby Syndrome." Id. at 13. The court went on to find that an investigation revealed "medical evidence of at least two (2) non-accidental incidents of physical abuse at least one of which involved a definitive impact," "[p]ossible seizure activity was noted," tubes were inserted to drain blood from the skull and provide nutrition," and MRI results showed an "older injury" that had caused "bleeding in the brain" with "multiple areas of stroke." Id. In addition, the court noted that Mother "plead[ed] guilty and was convicted" of Class B felony neglect of a dependent resulting in serious bodily injury with "[a]ggravating factors for sentencing" including "the young age of the child victim, Mother's position of trust in relation to the child victim, Mother's history of drug and alcohol use, and that Mother compounded the child's injuries by her actions," including failing to seek immediate medical attention for L.M. and failing to fully disclose medical history to treating physicians. Id. at 14. Moreover, the trial court noted Mother's current incarceration and earliest possible release date not occurring until February 2014.

Based on these and other findings, the trial court concluded that there is a reasonable probability that the conditions that resulted in the removal and continued placement of L.M. outside Mother's care will not be remedied. A thorough review of the record leaves us satisfied that clear and convincing evidence supports the trial court's

11

findings, and these findings, in turn, support the court's ultimate decision to terminate Mother's parental rights to L.M.

During the termination hearing, it was the overwhelming consensus of case managers and service providers that Mother had made no progress in services and/or her ability to provide L.M. with a safe and stable home environment. Specifically, case manager Haywood confirmed that Mother and Husband had both admitted to getting "easily frustrated" when caring for L.M. Tr. p. 50. Haywood also reported that while at the hospital, Mother provided "different stories" as to how L.M. may have sustained her injuries and had unrealistic expectations regarding the child's developmental milestones. Id. TCDCS case manager Regina Drummond likewise confirmed that the reasons for L.M.'s removal from Mother's care had not been remedied, that the child needs stability and "does not know [Mother]." Id. at 56.

Mother's own testimony provides further support for the trial court's judgment. During the termination hearing, Mother confirmed her history of past abusive relationships and substance use. Although Mother testified as to several services she planned to participate in while incarcerated, she acknowledged that as of that time she had failed to complete any of the court-ordered services, including a psychological examination, parenting assessment, substance abuse evaluation, parenting classes and all other court-ordered reunification services. In addition, Mother further acknowledged that her earliest possible release date was not until February 2014.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. In re E.S., 762 N.E.2d 1287 (Ind. Ct. App. 2002). Moreover, we have repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." Castro v. State Office of Family & Children, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), trans. denied. After reviewing the record, we conclude that TCDCS presented clear and convincing evidence to support the trial court's findings and ultimate determination that there is a reasonable probability the conditions leading to L.M.'s removal and/or continued placement outside of Mother's care will not be remedied. Mother's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265.

## II. Best Interests of the Child

Mother argues that the trial court's findings are insufficient to support a determination that termination of her parental rights is in L.M.'s best interests. However, Mother has waived this argument because she fails to appropriately develop or support her claim. See Ind. Appellate Rule 46(A)(8)(a) (requiring conclusions to be "supported by cogent reasoning" and "citations to the authorities, statutes, and the Appendix or parts

13

of the Record on Appeal relied on"). Her "argument" in this regard consists of statements that are generously characterized as inflammatory and/or unsupported such as "[I]f the [S]tate is tired of providing services or if the [S]tate feels the case should move on, the TPR provides a way to dispose of the file" and "That's right, [L.M.], we did not give your mom a chance to prove herself." Appellant's Br. at 17-18.

Waiver notwithstanding, the evidence in the record before us is more than sufficient to support the conclusion that termination of Mother's parental rights is in L.M.'s best interests. Mother's history of instability, substance abuse, mental health issues, history of abusive relationships, and current incarceration all support termination of her parental rights. See Lang v. Starke County Officer of Family & Children, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007) ("A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children."), trans. denied. Moreover, Mother lacks the ability to care and provide for L.M. medical needs.

CASA Devon Moore concluded that termination of Mother's parental rights was in L.M.'s best interests and that L.M.'s condition has improved during her foster care placement. L.M. has bonded with her foster placement and her special needs are being met. Finally, L.M. needs permanency that Mother cannot currently provide because she is imprisoned for neglecting and injuring L.M. See In re G.Y., 904 N.E.2d 1257, 1265 (Ind. 2009) ("Permanency is a central consideration in determining the best interests of a child.").

14

## Conclusion

For all of these reasons, we conclude that the trial court properly terminated Mother's parental rights to L.M.

Affirmed.

KIRSCH, J., and CRONE, J., concur.